POLYMER TECHNOLOGY v. HEMCON 2010-15-48 Mr. Kurtz Good morning, Your Honors. May it please the Court, I'm Ray Kurz with the firm Hogan Lovells for Appellant HEMCON. The first point I'd like to make is that if this Court, this case is primarily concerning claim construction, and if this Court agrees with HEMCON that the lower court's claim construction of the phrase biocompatible is wrong, and should not be limited to no detectable biological reactivity, and that only a definition that allows for at least some biological reactivity would be correct, it necessarily follows that the scope of the claims of the 245 patent were substantively changed during the course of re-examination, and that the doctrine of intervening rights applies. This is so because Marine Polymer admits, and it's not really this… Claim 6 wasn't changed. Claim 12 wasn't changed. Claim 20 wasn't changed. Those claims were changed. Before re-examination, all the claims were changed because the definition of biocompatible has been changed. The first thing that this Court needs to do is find out what's the correct interpretation of the term biocompatible. But 12 and 20 had a no reactivity standard from the beginning, right? They did not. They did not. If the Court agrees with us that biocompatibility has to include at least some reactivity, then those claims were changed because they were narrowed. After re-examination, claims 12 and 20 had to include some reactivity, and specifically only one test. They have some reactivity under any test after the re-examination. I'm sorry, before the re-examination, claims 12 and 20 had to have some reactivity. If you agree with that, claims 12 and 20 just specifically call out a specific test, the elution test of zero. I want to be clear about this. Before the re-examination, claims 12 and 20 had to include some bioreactivity, but the elution test had to be zero. After re-examination, there was no reactivity under any test. When did you make this argument in your brief? I'll find that for you, Your Honor. Your Honor, I don't want to consume your time. No, I'll find that for you. We did make this argument very clearly in the brief. But in the re-examination, correct me if I'm wrong, there wasn't a determination of a different meaning for biocompatibility. You just canceled certain claims where the elution test score was one or two, right? No, that's not correct. The key is that we look at the prosecution history and the re-examination and the arguments made in the re-examination. In the re-examination, Marine Polymer argued for a very specific, they argued for the interpretation of biocompatible that the judge gave it. They argued for the interpretation that the lower court used for the term biocompatible. They did that in order to distinguish the prior art. The examiner accepted that definition. So the question is, so there's absolutely no question, and Marine Polymer admits that after re-examination, that the lower court's definition of biocompatible is what the 245 patent means, namely no biological reactivity. Well, as I understand what you're saying about claims 12 and 20, is that it was originally drafted, they provided for a test score of zero under an elution test, and that after the re-examination, they required a no reactivity score under any test. Exactly. And that's exactly right. And we say that if the correct claim interpretation is applied, then there's clearly a narrowing of the claims, including claims 12 and 20. When you get up for your reply, show me where you made that argument. You don't have to do it now. Page 38? 38. Actually, I will. I'll do that on the reply. Yeah, please don't take your time. So that's exactly right, Your Honor. That's exactly the distinction, the difference between claims 12 and 20. There's no question that claims 12 and 20, in addition to every other claim, was narrowed during the re-examination when the definition of biocompatible of the lower court was adopted. There's just no question. The specification here would say that reactivity could be determined by a variety of different tests? Am I memory about that correct? It actually used the phrase by a variety of different techniques, which includes, some of those techniques obviously includes tests. But it also said the test article meets the test if none of the cultures show greater than mild reactivity, and the subsequent chart includes a rating of 2 for mild reactivity. That's exactly our point, Your Honor. That biocompatible, the correct definition of biocompatible, has to include at least some bioreactivity. There's no question about that. The original claims of the patent, before they were excised from the patent on re-examination, specifically called out for some bioreactivity. The portion of the specification, the written description portion of the specification, time and again, says the same thing. It says that, exactly as you said, if something is biocompatible, if it has at least some bioreactivity, that the court's claim interpretation was incorrect. And if you agree with that, and it sounds like the example that you've just provided is exactly on point, then there's no question that there was a narrowing during re-exam, thereby triggering the doctrine of intervening rights. But if you were to lose on 12 and 20, we'd affirm the judgment, right? Well, again, I think it's absolutely clear. No, I don't think so, because we've set forth arguments that 12 and 20, that there was a mistake made in the summary judgment on 12 and 20 with respect to infringement, because there was no evidence of an elution test performed on the Hemcon product. There was just no evidence of that. There was some statements in... I understand what your argument is, but my question was broader than that. If you lose on both of your two theories with respect to 12 and 20, then you lose overall, right? It doesn't do you any good to win on the other points. That's probably correct. I need to think about that, but I think that's right. And the court held that you waived questions whether you met the elution test. On the elution test issue, the lower court did rule that we waived the elution test argument. And we disagree with that. We don't think there was a waiver. And again, we look at summary judgment de novo. The real question is, not whether we waived it or not, was there any evidence presented showing that there was an elution test performed on the Hemcon product? And there's absolutely no evidence of a... But if you waived it, then that argument's gone. Well, again, I think you have to look at the summary judgment de novo and see, was there evidence supporting the judgment? And there was not evidence supporting the judgment with respect to the elution test. Could it be that the claim construction that was provided by the court in the original claims was incorrect? However, when the claims were narrowed, did that claim construction become correct? It's not a matter of whether it became correct or not. That's not the issue. And it wouldn't have become correct. Of course not. It's a two-step process. You have to look at the claims and the patent before the re-examination, say, what did this mean before the re-examination, and what does it mean after the re-examination? If anything, the fact that they made the amendments that they made... And narrowed the claims. And narrowed the claims. I hypothetically assume that they changed the claims and narrowed them and backed up into the proper determination by the court in the original claim construction. I think evidence is just the opposite, Your Honor. Evidence is the fact that the claims were wrong, had to be amended in order to give it a definition. Remember, when the court was looking at those claims that they amended and took out, were in the patent. So it's a different patent after the re-examination than it was before. But 6 was not. Claim 6 was made without amendment, right? Every claim was amended, in the sense that there was argument made narrowing the definition of biocompatibility. That's not an amendment. Well, I think this Court has told on numerous occasions that arguments made in the prosecution history are the legal equivalents of amendments. Imagine the mischief that could be done if someone could change the meaning of a term. Imagine the precedent that would be set if it was the other way around. If someone could change the meaning of a term through argument and just not change the word itself. The focus is on the scope of the claims as determined through the prosecution history. And it's well established that arguments made during prosecution are the equivalent of amendments. So yes, we would argue that an amendment was made through the argument. Even though the language of Claim 6 was not amended. Again, we would... It was amended by argument made before the patent office during the re-examination. Absolutely. Yes. If you're into your rebuttal, if you're confused, I'll save. I will save. Thank you. Mr. Poisson. Good morning, Your Honor. May it please the Court. First of all, I'd like to address the claim construction issue. I heard, I think I just heard for the first time in this appeal that biocompatible means some reactivity. Below, below, they argued constantly argued, and when it came to claim construction, they argued a bio microalgal source limitation. On the EVA trial, they put in a biocompatible definition, I think in the glossary on the EVA, I'm sorry, on the EVA, the Markman hearing. It's clear that the scope of the claims was changed, right, by the argument that was made in the re-examination. Absolutely. If we were to say, okay, the original scope of these claims didn't require no reactivity, then there was a change in the scope of those claims during the re-examination, right, by the argument that was made. Not as to claims 12 and 20, as you point out. If, in fact, your honors determined that the biocompatible means some mild reactivity, then the answer would be yes. But, as to claims 12 and 20, as you noted, you know, those always required an elution test score of zero, which is no detectable biological reactivity, which gets you back to exactly what, they're the same Well, what their argument was that the change that occurred in the re-exam means that there's no reactivity by any test. That is an interpretation of an interpretation, your honor. What the court said below was that there was no detectable biological reactivity as determined by biocompatibility tests. They are interpreting that as meaning all biocompatibility tests. Any and all biocompatibility tests. That issue has never been discussed anywhere in this case. The right answer is by any biocompatibility test. That's what I would say, that's your honor. Well, that issue has never been discussed before, your honor. I know it, and that's my point. My point is that it's, you know, when the court said by any biocompatibility testing, if you go to the patent, and if you go to section 10.1 example, it sets forth four biocompatibility tests that can be used to determine the level of reactivity. It sets forth, I believe, the elution test, the intracutaneous test, the intramuscular test, and the systemic test. You then go to the results section and the results section use all four tests, and in all four tests you determine that there's no detectable, come up with a result of no detectable biological reactivity. So any of those tests, if you do any of those tests and come up with that result, they're very different tests. Suppose on one test you get no reactivity but on the other three you get reactivity. Is the claim when the patient's satisfied? I believe it would be, your honor, under those circumstances. What's the basis for that interpretation in the spec? The spec basically says, you know, it doesn't say you have to do all of them. Granted, in the spec, all of them did show zero, but it doesn't say that all of them have to show zero. And we have an ambiguity in the court's claim interpretation that said bi is determined by biocompatibility testing. It didn't say all biocompatibility testing. Let me ask you about the damages. How does one justify the application of the entire marker rule here? In this particular instance, your honor, the evidence in the record clearly showed that the biocompatible P-glc-nac-poly-inacetylglucosamine was in fact a critical and essential component of the accused product. It is the ingredient that makes the accused product, allows the accused product to function as a hemostatic bandage, i.e. stop bleeding. So in that particular instance, the rest of the bandage is just a bandage. This is the critical chemical. Do you think it's not analogous to a piece of software where you have 20 or 30 different functions and it happens at a certain point? No, I don't think so, your honor. I think it's analogous to when you're dealing with a product that's got a critical... Was the product in the NSGL-glucosamine almost... They're one and the same. It's a bandage. You package it up and you package it up and this is the critical component that actually stops bleeding almost in an instance. It's quite fantastic how it works. And, interestingly enough, both experts below argued the entire market value rule. What was the evidence for 30% role? The evidence was pretty much the same evidence, your honor, was that the fact that these are direct competitors in the industry. They got their FDA approval by using our device as a predicate device, saying it was essentially the same type of device. And, again, I come back to the fact that it was a critical component of the product. Where did 30% come from? The industry standard for bandages? 30% came from the brackets that he was using, a willing buyer, a willing buyer who looked at the brackets, an upper bracket and a lower bracket, and then looked at the Georgia Pacific. I think the lower bracket was 26%. The upper bracket was 34%. He looked at the various Georgia Pacific factors and determined that 30% would be a reasonable royalty. And that was accepted by the jury. It allows them a profit. They do make a profit with the 30% royalty. They were still making a 4% profit. How about combining the military and the fact that one of the parties could not enter the military market by itself? The evidence in the record, your honor, showed that the reason that you know, I think it was prior to 2002, there was no, really was no military market to enter. After 2002, we could not enter the military market. And this is what the evidence showed, and the jury is allowed to accept, because they were there first. It's not because our product was not as good as their product, because they got there first. And the military entered into a contract. They are there, they're selling, and the Army's not going to make a change. Simple as that. Shouldn't it have been distinguished as between the civilian or military market at that point? No, the factors that he, the factors that the expert presented were basically the willing buyer, willing seller, and he backed it up. We originally argued lost profits for the military market, reasonable royalty for the non-military market, but he also presented evidence of reasonable royalty for the combined markets. And the evidence presented dealt with both markets under those circumstances, and the jury was entitled to accept that. Their attack, their attack on the damages, quite frankly, is they ignore all the favorable evidence in the record, and they point to no countervailing evidence. If you read their briefs carefully, all they have is attorney argument and a citation to their expert's report, which is not an evidence. Why don't intervening rights comply here? Three reasons, Your Honor. First and foremost, they argue that the initial claim construction has to be, this is in their briefs, the initial claim construction has to be their alternative claim construction that they presented on the eve of the Markman hearing below, i.e. biocompatible allows suitable for biomedical uses. That is an impermissible. That is not the correct claim construction. Their entire narrowing is premised on the fact that the original claims, biocompatible means that in the original claims. That is an impermissible, incorrect claim interpretation. It relies on one sentence in the summary of the invention that says that biocompatible P. glicknac or excuse me, that P. glicknac has several properties, including biocompatibility, that make it ideally suited for several purposes. And the idea that biocompatibility is one of those properties hardly equates biocompatibility with suitable for biomedical uses. The court below, even though they proffered that definition on the eve of the Markman hearing, the court below did consider it in its Markman hearing and reached that very conclusion. The argument of intervening rights, correct me if I'm wrong, is that the claims that are in effect are narrow. But they haven't been, Your Honor. Okay, the first reason they haven't been narrowed is because their starting claim construction is wrong. I don't understand how you can argue that. I mean, there were numerous claims that obviously required only slight, allowed slight reactivity. And those dependent claims were canceled. You read the specification, there's no suggestion in there that no reactivity is required other than with respect to this one example that you cite. And isn't it clear that in the course of the re-exam that the claims were narrow? No, I respectfully disagree, Your Honor, in the sense that the court's claim construction below was correct. Why was it correct? It was correct for several reasons. One, you go to column 10 of the patent. Column 10 of the patent, about halfway down, I think it's 48th of 5th lines, 48th of 53, specifically says that the P. Glicknack of the invention has a high degree of compatibility. You then go to the bottom of column 10, and it says if you want to know what we mean by a high degree of compatibility and how it's determined, go to example 10. Well, it doesn't say that. It says the working example presented in section 10 below demonstrates the high level of compatibility. It doesn't use example 10 to define what bio-compatibility means. But there's nothing, but follow me, that's exactly my point. It says go to example 10 and it will demonstrate the high bio-compatibility. You then go to example 10, I forgot exactly, column 46 maybe? 41. 41, the very beginning, the very first sentence of example 10. What does it say? It says the evidence presented in this example shows that the P. Glicknack of the invention has no detectable biological reactivity. But that doesn't say that no reactivity is required. It just says in this example there's no reactivity. It's true, but let me finish. In section 10.2, that's the beginning of example 10. In section 10.2 is the results. You look at the results of the four tests and you get no detectable biological reactivity. Go back to section 10.1, methods and materials. That talks about the four tests. It talks generically about the four tests, refers to various ASTM, American Pharmaceutical Standards, etc. It's generically describing the test. In theirs, that's where it says these tests can be passed with mild reactivity. They're talking about the test. The claims in the patent don't cover bio-compatibility testing and they don't cover a compound that merely can pass a bio-compatibility test. They cover P. Glicknack with bio-compatible P. Glicknack, which the court correctly determined as a high level of bio-compatibility and that is zero detectable biological reactivity because that's the results. They want to rely on the generic test to read a mild reactivity into the claims, but the claims call for the product. P. Glicknack, bio-compatible P. Glicknack. You have to understand, this patent was filed, the application was filed in December of 1993. For example, claim 4, one of the cancelled claims, talks about an elution test score of 1. That's inconsistent with the claim construction, isn't it? It's inconsistent with the court's claim construction. The case law specifically says, though, that dependent claims are an aid to claim interpretation. They are not conclusive. They are presumed to be narrower, but that presumption can be overcome and I submit, Your Honor, it is overcome in this case. They're all the same. It's the dependent claims elution test score of 1 and 2. The court below, actually the court below never considered it because they never argued it. And there's a waiver, a serious waiver issue that I haven't got to yet. But the court below looked at the product. This is the 15th patent that came out of this one application and this covers bio-compatible P. Glicknack. The court correctly went to the disclosure in column 10 and then it correctly went to the disclosure in example 10, which said high bio-compatibility, no detectable biological reactivity. It ignored the bio-compatibility testing because that was just a generic description of the test. That's where they said mild reactivity. That may have been the basis for having those claims in there in the first place because it's one of 15 patents. But that was the disclosure in the first place. But the court correctly found that in this instance, you know, cases such as North American vaccine and the University of California, there are cases where there's an inconsistent dependent claim but the presumption is overruled. You know, the contrary evidence in the specification dictates a different claim construction and I submit that this is one of those cases. And that's why there is no intervening rights because the claims weren't narrowed. If you look at what we argued, you know, they argued, we argued at the start of the re-examination that the court's claim construction below was correct. At the end of the examination, the court's claim construction still stood and there was no narrowing. And most importantly, there was no narrowing to avoid the prior art here. If you look at what happened in the re-examination, the original office action came down. The examiner said little or no bioreactivity was his definition. We responded by saying no, the correct definition based on the intrinsic evidence is what the district court found below. But in any event, these claims are valid under either construction. We argued either construction. Oh, he did. No, but that's true. That's true. But what he found, look at the patentability statement. In the patentability statement, he specifically said, I looked at the prior art now. Stanford is the most relevant reference. It's aspirational. And most importantly, he specifically found that it showed serious problems with biocompatibility. Serious, I think he used the word serious, substantive and serious problems. And therefore, all the claims were patentable. That, I submit, that finding by the patent office examiner would tell me that the claims were patentable, even under his standard of little or no reactivity, because he found the closest prior art was severe bioreactivity. So the claims were not narrowed. We argued both claim constructions in the reexamination. But I submit, again, I come back to the point that the two claims, 12 and 20, if you look at their claim construction that they're proffering now about suitable for biomedical purposes, those claims are valid over the prior art. The claim construction is exactly the same, whether it's their starting construction or the court's starting construction. The jury verdict specifically found that those two claims were not narrowed. They never attacked that jury verdict as being not founded on evidence or substantial evidence. And if you look at the summary judgment determination of infringement, you'll see that the court below, in addition to finding waiver because of the elution test, they... ... Thank you, Your Honor. ... First, I would like to point the court to the portion of our brief that discussed the issues of claims 12 and 20 and why they were... ...page 41 of our brief discusses that issue. And just to stay on that point for a second. First of all, in discussing that I made a misstatement in describing what the claim interpretation was. He said it involved biocompatibility testing. What the court's claim interpretation was, no reactivity as determined by biocompatibility tests. So with respect to the 12 and 20 issue, let me just give you an example. A product would be covered under the pre-reexamination patent if it scored, let's say, one on a variety of tests, one or more of the other tests, maybe the intramuscular test or something like that, but scored zero on the elution test. After the reexamination, that same product would not be covered because it would be outside the scope of the narrow claims because it scored one on the intramuscular test and after reexamination the biocompatibility can have no biological reactivity under biocompatibility tests even though it again scored a zero on the elution test. With respect to the claim construction argument, I just wanted to put that my colleague argued, I would like to point out something very telling in that argument. He used the phrase something to the effect of a high degree of biocompatibility that somehow the patent discusses a high degree of biocompatibility, but of course that's not what they claimed. They chose to claim biocompatible not a high degree of biocompatibility. And one final point that I want to make is clearly when the examiner withdrew the rejection, the examiner was, and there's no question, everyone agrees, that the examiner was using the claim interpretation that the court used in, again, finding no biological reactivity as shown by biocompatibility tests as a definition for biocompatibility. That's the definition that the examiner was using, the court's definition. That's what they argued on reexamination, that's what was applied, and that's why the examiner withdrew the rejection. Thank you. I'm sorry, could you repeat the question again? Because I want to make sure I get the exact... The part of the specification where it said four different tests, I think you already suggested it was column 42. Column 42, that's correct. It's where it begins. Thank you. Thank you, Your Honors.